61 P.3d 1141 (2003)
148 Wash.2d 451
HJS DEVELOPMENT, INC., Respondent,
v.
PIERCE COUNTY, acting through its DEPARTMENT OF PLANNING AND LAND SERVICES, Appellant.
No. 71430-4.
Supreme Court of Washington, En Banc.
Argued October 15, 2002.
Decided January 23, 2003.
*1143 Bertha Fitzer, Jill Guernsey, Tacoma, Hillis Clark Martin & Peterson, George Kresovich, Seattle, for Appellant.
Davis, Wright, Tremaine, Stephen Rummage, Jessica Goldman, Seattle, James Kelly, Fox Island, for Respondent.
*1142 SMITH, J.[*]
Appellant Pierce County seeks direct review of a Thurston County Superior Court *1144 judgment in favor of Respondent HJS Development, Inc., overturning a decision of a Pierce County hearing examiner which revoked a preliminary plat under a local ordinance, former Pierce County Code 18.50.970 and 18.50.975. The Superior Court reasoned that the hearing examiner did not have authority to revoke Respondent's preliminary plat approval because state platting laws, chapter 58.17 RCW, preempt revocation powers of local jurisdictions on preliminary plat approvals.

QUESTIONS PRESENTED
The questions presented in this case are (1) whether the Pierce County hearing examiner had the authority to revoke a preliminary plat approval under former Pierce County Code 18.50.970 and 18.50.975; (2) whether state laws, chapter 58.17 RCW establishing procedures for approving subdivision platspreempt local ordinances which permit a hearing examiner to revoke a preliminary plat approval; (3) whether revocation powers under the Pierce County Code conflict with RCW 58.17.140, which provides that a final plat meeting all requirements shall be submitted for approval within five years of preliminary plat approval; and (4) whether the decision by the Pierce County hearing examiner was clearly erroneous because he did not consider less harsh sanctions in enforcing conditions of the preliminary plat approval.

STATEMENT OF FACTS
On December 30, 1994 Respondent Fox Ridge Investments[1] filed a complete application[2] for approval of preliminary plat and site plan for a 71-acre parcel on Fox Island in unincorporated Pierce County.[3] In its proposal, Respondent requested permission to divide the parcel into a subdivision of 63 single-family residential lots to be served by private roads, on-site septic, and public water. Division I consisted of 42 lots. Division II consisted of 21 lots.[4] The plat is bisected by a road, Island Boulevard, and a substantial portion of Division I contains steep slopes, a mixture of coniferous and deciduous vegetation, and forests containing protected trees. Single-family residential homes are located below a portion of the steep slopes and near the proposed development site.[5]
At the time the plat application was filed on December 30, 1994 and prior to the effective date of the County's Comprehensive Plan, the local zoning laws, Rural-Residential Environment,[6] permitted one dwelling unit per acre.[7] On January 1, 1995 the property was rezoned R-10, which allowed a maximum residential density of .25 dwelling unit per acre.[8] Also in existence at the time of filing were local regulations, Gig Harbor Peninsula Development Regulations 18.50.970 and 18.50.990 which granted the hearing examiner the power to revoke or modify any permit, use or activity granted pursuant to the Pierce County Code or allowed pursuant to the Underlying Zone. ...[9]
*1145 In the review process for the proposal, Respondent was required to submit a geotechnical report to the Development Engineering Section.[10] In June 1997 Respondent submitted a report prepared by David Evans and Associates, Inc., which included a description of the topography in Division I.[11] The report indicated the property contained steep slopes, with the steepest slopes occurring across the southern boundary with grades ranging from 30 percent to 87 percent, approximately 100 to 150 feet in height.[12] The geotechnical report also indicated that landslide and erosion hazards were moderate to severe where slopes exceeded 30 percent.[13] It therefore recommended a 50-foot setback and buffers from the top of the slopes and only allowing selective clearing.[14]
On December 3, 1997 the Pierce County environmental official, Charles F. Kleeberg, issued a mitigated determination of nonsignificance (MDNS).[15] No appeal was filed. In its findings of fact, the responsible official found that the project came within a landslide and erosion hazard area, as defined and regulated by Pierce County Code, chapter 21.14, "Geologically Hazardous Areas," and that relevant local ordinances[16] allowed approval of the proposal subject to conditions in order to mitigate any probable significant adverse environmental impacts.[17] The responsible official concluded that Respondent's "proposal [did] not have a probable significant impact on the environment, and an Environmental Impact Statement (EIS) [was] not required under RCW 43.21C.030(2)(c), only if the following conditions [were] met."[18] Of the 12 conditions specified in the MDNS, the following conditions are relevant to this appeal:
Condition (1) stated in part:[19]
The [Oregon White Oak Preservation] plan shall cause the preservation of not less than 80% of the Oregon White Oaks....
Condition (6)(a) stated:[20]
The proposal shall comply with all recommendations contained with the June 1997 geotechnical report prepared for the development with the following modification:
a. Clearing within the building setback area shall be limited to removal of dead and dangerous trees and reasonable topping, clearing, and limbing for the purposes of creating view areas. Clearing below the top of the steep slope located on Lots 3 through 29 shall be prohibited, except that the applicant may selectively top, limb, or remove trees within this area to enhance view. Prior to the removal of any vegetation within this area, the applicant shall submit a clearing plan for the area to the Resource Management Development Engineering Sections of the Pierce County Planning and Land Services Department for review *1146 and approval. The purpose of the review shall be to ensure that vegetation removal in this area is strictly limited to only that reasonably necessary to provide for view areas within the lots and the removal of hazardous trees. Vegetation removal beyond this shall be prohibited.
. . . .
Condition (4) stated:[21]
The edge of the Oregon White Oak Preservation Area shall be clearly staked and flagged prior to and through the completion of site development and construction. Prior to final plat approval, signage denoting the Oak Preservation Area shall be erected along the boundary of the area. The type of spacing of the signage shall be determined by the Pierce County Planning and Land Services Department.
. . . .
Condition (8) stated:[22]
The steep slope and building setback area shall be clearly shown and labeled on the face of the preliminary and final plat as "Slope Protection Area Easement."
Condition (9) stated:[23]
The following shall be placed on the face of the final plat:
"The Slope Protection Area Easement appearing on this plat shall remain in its natural state. The intent of this area is to protect slope stability and prevent erosion. There shall be no clearing, grading, filling, or construction of any kind within this area, except as shown on plans or documents approved by the Director of Pierce County Planning and Land Services, and contained in the official files for this project. Removal of dead or dangerous trees may be permitted upon receiving written approval from the Pierce County Planning and Land Services Department."
. . . .
Condition (11) stated in part:
In order to minimize erosion, changes in surface water runoff characteristics, and minimize impacts to aesthetics and the rural character of the site, vegetation removal from the site during site development phase of the proposal, shall be limited to those areas necessary for the construction of roads and utilities, creation of building pads, and view shed creation approved by the Pierce County Planning and Land Services Department. Except for the clearing discussed above, all lots shall remain in their natural, vegetated state until the time of building permit issuance.
. . . .
The Peninsula Advisory Commission (PAC) considered the proposed preliminary plat and heard public testimony at its January 14, 1998 meeting.[24] It recommended denial, citing concerns of storm water control, slope stability, and an incomplete application. However, it proposed two conditions in the event the hearing examiner approved the proposal.[25] The first condition required the applicant to conduct a study for frontage road improvements along Island Boulevard. The second required a 25-foot-wide perimeter buffer along the lot lines to act as a barrier to visibility, airborne particles, glare and noise impacts.
On February 5, 1998 a public hearing was held before Hearing Examiner Stephen K. Causseaux, Jr.[26] Fox Island residents raised concern about landslides in the area and submitted a geological report prepared by James P. Brazil, engineering geologist, on October 21, 1981, recommending against further tree or vegetation removal. The Pierce County Planning and Land Services Department (PALS), Hugh Taylor, presented a staff report on the proposed preliminary plat.[27] He described the proposal and discussed its restrictions on clearing, testifying that "the *1147 slopes, themselves are intended to stay in a natural, undisturbed state," and barring limbing for view enhancement and removing dangerous and dead trees, "the slope is off limits for development."[28] He further noted that the Oregon white oaks within the development area were protected under the county critical areas ordinance, and detailed the plans for preservation of those trees.[29] In response, Joseph Quinn, attorney for Respondent, testified that clearing would stay within the limits and clearing and development would be done in accordance with the county's regulations and under the county's supervision.[30] He acknowledged the restrictions on development, stating that the developer would act responsibly and comply with conditions.[31]
On September 2, 1998 the hearing examiner issued a report and decision approving the preliminary plat, subject to specified conditions, including those recommended by the PAC and Planning Staff and all those required by the MDNS.[32]
Respondent applied for a site development permit for clearing in preparation for road construction in Division I on March 24, 1999.[33] On May 20, 1999 Pierce County approved the site development permit consistent with the conditions announced by the hearing examiner. The plan noted that the Oregon White Oak Preservation Area would be flagged and clearing would proceed in the designated areas. A provision in the site development plan required Respondent to notify the county 48 hours prior to beginning any construction at the site and prior to initiation of clearing.[34] Respondent and a county inspector conducted a preconstruction meeting reviewing requirements of the site development permit.
On April 18, 2000, Ray Clark, a county inspector, conducted an unscheduled site inspection.[35] He discovered that significant clearing had occurred. He believed the clearing did not comply with the limitations specified in the site development plans.[36] He reported that many of the clearing limits had been disregarded, as evidenced by removal of trees from the steep slopes, buffer areas, and the oak protection areas. He testified that an estimated 150 trees were logged outside the approved plan, and stumps on the slopes measured from 18 inches to 2½ feet in diameter.[37] A subsequent investigation substantiated the report of violations, revealing that more than 200 stumps had been cut from the steep slope areas, many stumps had been burned and removed, and there were not sufficient erosion control methods.[38] With these reported violations, the PALS posted a stop work order and contacted the Department of Natural Resources (DNR).[39]
The DNR inspected the site and ultimately concluded that a forest practices permit was required for the west slope, but not for the other areas outside of this slope. Based upon this, the DNR issued a stop work order on May 8, 2000.[40] Pursuant to local development regulations and state law, PALS imposed a six-year Forest Practices Act of 1974 development moratorium.[41]
On May 17, 2000 PALS notified Respondent it would take action to revoke the preliminary plat because of the violations of site development regulations and the preliminary plat conditions.[42] On May 26, 2000 Respondent *1148 filed a request to the hearing examiner to lift the moratorium. A public hearing on the revocation action and moratorium rescission was held on October 4, 2000.[43]
At the hearing, County Planner Taylor and County Inspector Clark presented exhibits and photographs detailing the extent of the violations of conditions.[44] Mr. Taylor noted that the original conditions allowed some limbing and tree removal, but did not allow a clear-cut of the buffer or slope.[45] He concluded that approximately seven acres were removed from the top of the slopes. Respondent's attorney, Mr. Quinn, conceded in testimony that trees within the White Oak Preservation Area and trees on the steep slope were cut, but he disputed the extent and exact number of trees cut.[46] He asserted that, despite the fact that prohibited cutting occurred, removal of the trees did not violate the conditions because the approvals allowed for selective cutting and removal which did not negatively impact the stability of the present slope.
On November 13, 2000 the hearing examiner revoked the site plan and preliminary plat approvals and denied the request to rescind the moratorium.[47] In his decision, the hearing examiner concluded that[48]
[t]he clearing of the 50-foot landslide and erosion hazard area buffer and the removal of numerous significant trees on the steep slopes below the top of the bank constitute intentional and flagrant violations of conditions of approval and mitigating measures set froth in the Mitigated Determination of Nonsignificance issued pursuant to SEPA [State Environmental Policy Act of 1971, chapter 43.21C RCW] review.... These violations are especially egregious because the most significant issues associated with site plan and preliminary plat approval were concerned with protection of the steep slopes, the proper handling of storm water runoff, and the protection of homes below the slopes near the shoreline. The environmental official also imposed a number of mitigating measures addressing the preservation of vegetation on the slope and establishing an Oregon White Oak Preservation Area, all of which were agreed to by the applicant to avoid issuance of a Determination of Significance and preparation of an Environmental Impact Statement.

(Emphasis added.)
Respondent filed a timely request for reconsideration on November 22, 2000.[49] In addition, Respondent requested that the hearing examiner reopen the proceedings or allow a rehearing pursuant to a local law and rule.[50] The hearing examiner denied the request on January 4, 2001.[51]
On January 24, 2001 Respondent filed an appeal in the Thurston County Superior Court under the Land Use Petition Act (LUPA), chapter 36.70C RCW, challenging the revocation and the moratorium.[52] Its appeal reiterated the same arguments considered in the administrative hearing, and raised a new argument contending the hearing examiner exceeded his authority in revoking the preliminary plat.[53]
The Thurston County Superior Court, the Honorable Daniel J. Berschauer, granted the LUPA petition and presided over the bench trial on June 7, 2001.[54] He decided in favor of Respondent HJS Development, Inc., reversing the hearing examiner's decision revoking *1149 the preliminary plat.[55] The court reasoned that state statutes governing plats and subdivision of land preempted the local revocation ordinance under which Hearing Examiner Taylor proceeded in revoking Respondent's preliminary plat.[56] The court invalidated the ordinance, ruling that it conflicts with state law, reasoning that if the Legislature intended to allow revocation of a preliminary plat, it would have expressly done so.[57] The court ruled, in the alternative, that the hearing examiner's decision was clearly erroneous because he did not consider other viable and less harsh legal options to enforce the conditions and require compliance.[58]
Appellant filed a notice of direct appeal with this court on August 7, 2001.[59] Review was granted on July 1, 2002.[60]

DISCUSSION

STANDARD OF REVIEW
Judicial review of a land use decision proceeds under the Land Use Petition Act (LUPA).[61] A petition for review by the superior court constitutes appellate review on the administrative record before the local jurisdiction's body or officer with the highest level of authority to make the final determination.[62] Relief may be granted when the following standards set forth in LUPA are met:
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
. . . .
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates constitutional rights of the party seeking relief.[63]
"When reviewing a superior court's decision on a land use petition, the appellate court stands in the shoes of the superior court."[64] "An appellate court reviews administrative decisions on the record of the administrative tribunal, not of the superior court."[65] We therefore review the record before the Pierce County hearing examiner and review questions of law de novo to determine whether the land use decision was supported by fact and law.[66]

STATE AND LOCAL PLATTING AND SUBDIVISION PROCESSES
Development of real property in this state implicates both state statutes and local ordinances that impose subdivision and platting controls. The state statute, chapter 58.17 *1150 RCW, provides a general statutory scheme for regulating subdivision of land to ensure the orderly development of new areas for which new streets, sewers, drainage, and utilities will be needed.[67] The owner or developer initiates the subdivision process by filing a preliminary plat and a complete application for approval by the legislative body of the city, town, or county.[68] A preliminary plat is a "neat and approximate drawing of a proposed subdivision showing the general layout of streets and alleys, lots, blocks, and other elements of a subdivision consistent with the requirements of [chapter 58.17 RCW]."[69] The local planning agency or designated official then considers whether the proposed plat complies with the local comprehensive plan and adopted specifications and standards, and makes recommendations to the local legislative body.[70]
Upon receipt of the recommendation, the legislative body conducts a public hearing on the plat application. In Pierce County the legislative body by ordinance has delegated to the hearing examiner the authority to review and decide plat applications.[71] Approval of a preliminary plat may be subject to conditions imposed by the hearing examiner.[72] Once approved, the owner or developer may begin development to prepare the final plat in compliance with the preliminary plat.[73]

AUTHORITY TO REVOKE GRANTED BY LOCAL ORDINANCES
Respondent contends the dispositive issue in this case is whether the hearing examiner possessed the power to revoke the preliminary plat.[74] It argues that the local revocation ordinances under which the hearing examiner proceeded, former PCC 18.50.970 and .975, did not grant him authority to revoke the preliminary plat. Respondent asserts that the local ordinances, former PCC 18.50.970 stating that "[t]he Examiner may revoke or modify any site plan approval or permit, and former PCC 18.50.975 providing that [t]he Examiner may revoke or modify any permit, use or activity granted pursuant to the Pierce County Zoning Code...." do not include preliminary plats within their purview.[75]
Although the distinction between site plan approval and preliminary plat approval has been blurred with at least one Court of Appeals decision using the two terms interchangeably,[76] Respondent correctly notes *1151 that the county code treats the two as distinctly separate processes.
Former PCC 18.50.960 read in part: "Plats are exempt from all procedural requirements of the site plan review process; however, a plat when being reviewed during the preliminary plat review and approval process, shall be reviewed for consistency with the Gig Harbor Development Plan.... A plat is exempt from [the] site plan approval process ...."[77] This distinction is further supported by two proceedings: one in which the county hearing examiner in the revocation proceedings revoked "Division I of the Fox Ridge site plan approval and preliminary plat,"[78] and the other in which the Court of Appeals, Division Two, vacated and voided rezone ordinances, site plan approval, and plat approval adopted by the City of Tacoma....[79] RCW 58.17.070 also treats the two terms distinctly, allowing processing of a preliminary plat application simultaneously with site plan applications.
An administrative tribunal, such as the hearing examiner in this case, has only the authority granted it by statute or ordinance.[80] Based upon distinct treatment of the two processes, a site plan or permit is not a preliminary plat.[81] In this case, the local ordinance allowing revocation of site plans and permits did not grant the hearing officer authority to revoke a preliminary plat. Without more, the purported revocation of the preliminary plat would not be valid under former PCC 18.50.970.
Interpretation of local ordinances is governed by the same rules of construction as state statutes.[82] In considering an undefined term, the court considers the statute as a whole to give meaning to the term in harmony with other statutory provisions.[83] Rules of construction do not apply when the language is clear and explicit.[84] In interpreting statutes and ordinances, definitions contained within the act control the meaning of words used in that act.[85] Courts must reasonably construe ordinances with reference to their purpose.[86]
Former PCC 18.50.975 provided for revocation of any permit, use or activity granted under the Pierce County Zoning Code. However, it did not expressly include preliminary plats as one of the three revocable categories. Respondent distinguishes preliminary plats from the three categories by reference to the definitions and derived meanings contained in former chapter 18.50 PCC.
In interpreting the three categories (permit, use or activity) listed in former PCC *1152 18.50.975, this court examines the definitions and meanings of those terms contained in the regulations.[87] The definition of "preliminary plat" (a representation of the proposed general layout) is not included in the meaning of "permit or activity." "Activity" is defined as any use conducted on a lot, tract or parcel of land,[88] and from the local development regulations, "permit[s]" take effect during the developmental phase of the property where some physical activity is involved.[89] In the context of zoning, "activity" has been used to characterize the types of conduct or business occurring on the land,[90] while "permit[s]" under the county code relate to a governmentally approved activity such as a nonconforming use permit or a building permit.[91] A preliminary plat (a tentative representation of the details of a project) thus does not come within the meaning of an "activity" or "permit."
Former chapter 18.50 PCC defined "use" as follows:
"Use" of property is the purpose or activity for which the land, or building thereon, is designed, arranged or intended, or for which it is occupied or maintained and shall include any manner of performance of such activity with respect to the performance standards of this Regulation. The word "use" also means the word "development."[92]
Under the first definition, a broad reading of "use" includes the definition of a preliminary plat. Construed broadly, "use" can be read to mean "the purpose ... for which the land, ... is designed, arranged, or intended...."[93] A rough sketch of the proposed alleys, blocks, and streets would fit within such a reading. However, a further reading of the same sentence following the disjunctive clauses with the conjunctive "and" indicates that the definition of "use" "shall include any manner of performance of such activity with respect to the performance standards of this Regulation."[94] This last element of the definition contemplates involvement of some type of "activity" impacting the land. A preliminary plat does not impact the land in a similar manner as does "use" under the regulations.
The Pierce County Code further clarifies the meaning of the word by providing a second definition of "use."[95] Under the county code "development" or "use" shall mean:
A. Any activity, other than normal agricultural activity which materially affect the existing condition of land or improvements, such as:
1. Clear cutting of trees ...
2. Substantial excavation of deposits of earth ...
3. Construction, reconstruction or alteration of any improvement ...
4. Dumping or parking of any objects...
*1153 5. Commencement of any primary or substantial use of land and every change in its type of intensity.
B. Any change in the legal relationship of persons to land which materially affects development, such as: the division of land into two or more parcels or units to facilitate separate transfer of title to each parcel unit.[96]
Under this definition, an activity materially affecting the condition of land is one that physically impacts it. Examples of "uses" listed in the definitioncutting, excavation, construction, dumping, and parkingrepresent physical actions occurring on the land. A preliminary plat, which is merely a drawing, does not physically impact the land in a similar manner as does a specific land use applied in this context.[97] This definition restricts the term "activity" to a physical activity to or upon the land. Part (B), however, departs from this limitation and expands the meaning of "use" to include conduct which is not physical.
Part (B) of the definition becomes operative when a change in the legal relationship of persons to land materially affects development, such as division of land. Respondent argues there was no such change in this case. A preliminary plat, it asserts, does not affect the division of land.[98] Subdivision of land occurs upon final plat approval, which is not guaranteed by approval of a preliminary plat.[99] It contends a preliminary plat has no effect on the legal relationship of developer to land which materially affects development. It asserts that preliminary plat approval is not a "use."
This argument is somewhat shortsighted in that it assumes preliminary plat approval and final plat approval are separate and distinct processes. The initial and essential step in obtaining final plat approval is receiving preliminary plat approval.[100] A preliminary plat application notifies the local government of the applicant's intention to follow plat subdivision procedures to gain final plat approval. Once receiving preliminary plat approval, an owner or developer may proceed to prepare detailed engineering drawings, construct improvements, and prepare the final plat in compliance with the terms and conditions of the approved preliminary plat.[101] Approval (with terms and conditions) of that application by the local government acknowledges the developer's reliance on that approval in undertaking the plat subdivision process. This approval creates a change in the legal relationship of the owner or developer to the land which materially affects development.[102] Although the right to subdivide land arises from final plat approval, approval of a preliminary plat begins the plat subdivision process. The right to subdivide land arises out of preliminary plat approval. Without a preliminary plat, final plat approval may never be achieved.[103] As indicated in the definition section of the ordinance, a preliminary plat approval for a subdivision is a "use."
This conclusion is consistent with the revocation ordinance. Former PCC 18.50.975 permits revocation of a use, but only when granted pursuant to the Pierce County Zoning Code or Underlying Zoning.[104] In this case, the applicable local zoning law was the Rural-Residential Environment, which specified the particular developments and uses permitted.[105] The zoning code divided permitted *1154 developments and uses into three categories.[106] Like the statutory definition, Category (C)(1) expressly considered a subdivision a permitted "use" under the zoning code.[107]
We conclude that a preliminary plat is within the definition of a "use" and that the revocation ordinance granted the hearing examiner authority to revoke a preliminary plat. The Pierce County hearing examiner had the authority to revoke Appellant's preliminary plat.

PREEMPTION
Our state constitution, article XI, section 11, allows a county, city or town to "make and enforce within its limits all such local police, sanitary, and other regulations as are not in conflict with general laws."[108] Within this authority counties have plenary police power to enact ordinances, which ceases when in conflict with general state law or when the Legislature intended state law to be exclusive, unless there is room for concurrent jurisdiction.[109] Whether there is room for exercise of concurrent jurisdiction depends on legislative intent which is derived from analysis of the statute.[110]
Preemption arises when the Legislature has expressed its intent to preempt the field or that intent is manifest from necessary implication.[111] If the Legislature is silent on its intent to occupy a given field, we may refer to the purposes of the particular legislative enactment and to facts and circumstances upon which the statute was intended to operate.[112]
In establishing the constitutional invalidity of an ordinance, a heavy burden rests upon the party challenging its constitutionality.[113] "Every presumption will be in favor of constitutionality."[114] This appeal places at issue the constitutional validity of a local ordinance, former PCC 18.50.975, which granted the Pierce County hearing examiner authority to revoke an approved preliminary plat. Former PCC 18.50.975 allowed revocation of permits, uses, and activities.[115] Respondent contends that grant of such authority impinges upon and violates the state platting laws, chapter 58.17 RCW, which call for land to be divided in a uniform manner. The Thurston County Superior Court, Judge Berschauer, agreed, finding that RCW 58.17.010 expressly evidenced the Legislature's intent to preempt local jurisdictions from enacting conflicting legislation.[116] In support of a preemption conclusion, both Judge Berschauer and Respondent cited the following language in RCW 58.17.010 which sets out the purpose of the chapter: "The legislature finds the process by which land is divided is a matter of state concern and should be administered in a uniform manner *1155 by cities, towns, and counties throughout the state."[117]
Similar uniformity language was discussed in City of Seattle v. Williams, a case challenging a local traffic law. Williams provides some guidance in interpreting the word "uniform" in the preemption context and applied the concept of uniformity to a given field.[118] The question in Williams was whether two general statutes requiring uniformity of traffic laws preempted a city ordinance criminalizing driving under the influence (DUI) at a blood alcohol concentration (BAC) of .08 grams.[119] RCW 46.08.020 stated:
The provisions of this title [Title 46 Motor Vehicles] relating to vehicles shall be applicable and uniform throughout this state and in all incorporated cities and towns and all political subdivisions therein and no local authority shall enact or enforce any law, ordinance, rule or regulation in conflict with the provisions of this title except and unless expressly authorized by law to do so and any laws, ordinances, rules or regulations in conflict with the provisions of this title are hereby declared to be invalid and of no effect. Local authorities may, however, adopt additional vehicle and traffic regulations which are not in conflict with the provisions of this title.
(Emphasis added.)
RCW 46.08.030 provided:
The provisions of this title relating to the operation of vehicles shall be applicable and uniform upon all persons operating vehicles upon the public highways of this state, except as otherwise specifically provided.
(Emphasis added.)
Without a statutory definition of "uniform," in interpreting the statutes we employed the dictionary definition of the word, defining it to mean "marked by lack of variation, diversity, and marked by complete conformity to a rule or pattern or by similarity in salient detail or practice."[120] Incorporating this definition, we concluded the statutory scheme relating to motor vehicles must "lack variation," and that the Legislature intended the provisions of Title 46 to be uniformly applied throughout the state.[121] We additionally considered how the challenged ordinance establishing the offense at 0.08 grams of alcohol disrupted the uniform statewide application of state DUI laws which criminalized DUI at the 0.10 percent BAC level. We found that the ordinance, varying in salient detail from the state law on DUI, significantly undermined the uniformity requirement of both RCW 46.08.020 and RCW 46.08.030.
In Williams we concluded that the "uniform" language found in the statutes evidenced the Legislature's intent to create a statutory scheme with the same standards consistently applicable throughout the state. In this respect, the uniformity requirement preempted local legislative bodies from enacting ordinances inconsistent with the standards set out in state traffic laws. Because the challenged ordinance departed from the state DUI standard of .10 percent BAC, we concluded that the ordinance violated the statutory uniformity requirement, but we were "not saying that a municipality may never enact traffic laws for which there is a statutory provision on the same subject,"[122] rejecting Respondent Williams' argument that the uniformity requirement of the state statutes preempts all ordinances directed against DUI.
Although Williams provides some guidance on the preemption issue in this case, it is, however, distinguishable. Unlike Williams, this case does not involve an ordinance that varied in detail from standards established by state laws. Relying on Williams, Respondent argues that state platting laws, specifically RCW 58.17.100, requiring only approval or disapproval of a *1156 preliminary plat,[123] preempts the revocation ordinance because it departs from the statutory scheme. Reliance on Williams for this proposition is misplaced.[124] In this case, the revocation ordinance does not depart from the state statutory scheme of uniformity. State platting laws are silent on revocation of a preliminary plat.
Located in the purpose section and having no operative force, the "uniform" language in RCW 58.17.010 serves only as a guide to the intended effect of the operative sections.[125] This means the process of dividing land in one county should "not vary" from another in which all local governments must follow the procedures specified in chapter 58.17 RCW. Because RCW 58.17.010 does not contain the "exclusivity" language identified in the Williams case, no meaning of "uniform" can be ascertained to preempt the entire field of dividing property. This court "will not interpret a statute to deprive a municipality of the power to legislate on a particular subject unless that clearly is the legislative intent." We do not interpret the purpose section of chapter 58.17 RCW to deprive a county of the power to revoke a preliminary plat because it is not clear under the statute whether the Legislature intended such deprivation.[126]
Respondent's uniformity requirement argument is also undercut by the fact that local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or condition such approvals to mitigate problems caused by a development.[127] This court in Isla Verde International Holdings v. City of Camas and the Court of Appeals in Norco Construction v. King County have acknowledged the authority of local governments to supplement state platting laws for the public health, safety, and welfare.[128] Under this authority, the challenged ordinance in this case was appropriately enacted to allow revocation of an approved "use" when that use is exercised against the public health, safety or general welfare.[129] The statutory scheme of chapter 58.17 RCW is designed to protect the public health, safety and general welfare. In recognition of this, the Legislature has left room for concurrent jurisdiction in matters relating to these interests.[130] Former PCC 18.50.975 providing for revocation of a preliminary plat was not preempted by RCW 58.17.010.

CONFLICT
We must decide whether there is a conflict between former PCC 18.50.975, allowing revocation of a preliminary plat, and RCW 58.17.140, providing that a final plat meeting all requirements of the chapter shall be submitted for approval within five years of the preliminary plat approval. Local jurisdictions may enact ordinances upon subjects already covered by state legislation if their enactment does not conflict with state legislation.[131] This court will consider an ordinance to be constitutionally invalid on grounds of conflict if the ordinance "directly and irreconcilably conflicts with the statute."[132] If, however, the ordinance and statute can be harmonized, no conflict will be found.[133] Unconstitutional conflict occurs *1157 when an ordinance permits what is forbidden by state law or prohibits what state law permits.[134]
Respondent interprets RCW 58.17.140 to unconditionally allow it five years following preliminary plat approval to comply with conditions and requirements. It asserts the Legislature chose this policy to bring preliminary plats within the arena of vested rights to instill certainty of the rules governing land development. Its vested right, Respondent contends, may only be extinguished upon a finding that the final plat as submitted does not conform to preliminary plat conditions or operative development regulations, and that revocation of the preliminary plat before five years has expired violates its vested right.[135]
Respondent misconstrues RCW 58.17.140. Its contention assumes that the provision grants it an unqualified right to develop its property without limitation for five years after preliminary plat approval. RCW 58.17.140 does not support such an assumption. The provision sets a time limit for preliminary plats.[136] It still requires full compliance with conditions and requirements of preliminary plat approval before a final plat can be submitted for review and approval.[137]
Respondent also misunderstands the concept of vested rights in the preliminary plat review and approval context. Its argument assumes that the doctrine confers without limitations or conditions a right to develop the land for five years after preliminary plat approval. The vesting doctrine has generally been applied in the preliminary plat context merely to confer the right to have an application for preliminary plat considered under ordinances and laws in effect at the time a completed application is filed.[138] Chapter 58.17 RCW is silent on revocation.
Subdivision of land is both a local and statewide concern. State platting laws expressly charge local governments with the duty to ensure that the public interest is best served by approval of preliminary plats and final plats.[139] The Legislature has provided that local governments may adopt regulations for the public health, safety, and general welfare[140] in considering plat approval. When conditions of approval of a preliminary plat cannot be satisfied or are deliberately violated, remedial action, such as revocation, may be the only remedy. A revocation ordinance may be reconciled with state platting laws in circumstances under which revocation is necessary to protect the public health, safety and welfare. Revocation of a preliminary plat is appropriate in those cases in which it is impossible to satisfy the conditions of approval because of knowing and deliberate violations of conditions.

DECISION BY HEARING EXAMINER
When reviewing a superior court's decision on a land use petition, we review the record of the administrative tribunal and not the record of the superior court.[141] In this case we review the record before the Pierce County hearing examiner de novo to determine whether there was evidence to support the land use decision.[142]
Respondent contends the hearing examiner's decision was erroneous because he did not consider whether Respondent could satisfy the requirements for final plat approval within the statutory time period of five years, and that less drastic remedial *1158 methods than revocation were available to enforce the violated or unfulfilled conditions. It argues that despite its removal of trees in the preservation area and on the steep slopes, the hearing examiner committed error by not determining whether removal of those trees jeopardized the public interest by negatively impacting the stability of the slope.[143]
Respondent, however, cannot satisfy the requirements for final plat approval because it cannot meet the conditions of preliminary plat approval which specifically prohibited removal of trees and vegetation in specified areas. The conditions imposed contemplated the public safety and welfare. It is clear from the record that Respondent knowingly and deliberately violated conditions of preliminary plat approval which cannot be remedied. Respondent can never comply with the specified conditions of the plat approval because, among other reasons, the removed white oak trees cannot be restored to their original state. Monetary fines and remediation methods cannot correct the violations committed by Respondent. Revocation was the only proper remedy.

SUMMARY AND CONCLUSIONS
At issue in this case is the revocation of a preliminary plat under former Pierce County Code (PCC) 18.50.970 and 18.50.975. Respondent contends the Pierce County hearing examiner exceeded his authority in revoking its preliminary plat because the local revocation ordinance, allowing revocation of any site plan permit or approval, permit, use, or activity, did not include preliminary plats.
Site plans, permits, and activities do not come within the definition of a preliminary plat (a drawing of the proposed subdivision showing the general layout of streets and alleys, lots, and blocks). The definition of use under the ordinance, however, includes subdivisions. Because preliminary plat approval initiates the subdivision process, approval of a preliminary plat for a subdivision is a "use." The ordinance therefore granted the hearing examiner authority to revoke a preliminary plat.
Respondent contends that state platting laws, chapter 58.17 RCW, preempted enactment of any ordinance allowing revocation of preliminary plats. It erroneously relies on City of Seattle v. Williams to support its argument that the language in RCW 58.17.010, calling for land to be divided in a uniform manner, evidences the intent of the Legislature to preempt the field. Williams is distinguishable. Legislative intent is clear from the provisions at issue in that case, but not clear from the provision at issue in this case.
Respondent's uniformity requirement argument is also undercut by the fact that local jurisdictions are solely responsible for preliminary plat and final plat approvals, and may adopt regulations or conditions for those approvals. This court in Isla Verde International Holdings v. City of Camas and the Court of Appeals in Norco Construction v. King County have acknowledged the authority of local governments to supplement state platting laws for the public health, safety, and welfare. Under this authority the revocation ordinance, former PCC 18.50.975, was properly enacted and not preempted by state platting laws.
Respondent claims there is a conflict between the revocation ordinance and RCW 58.17.140, which provides that a final plat meeting all requirements of the chapter shall be submitted for approval within five years of preliminary plat approval. Respondent misinterprets this provision as granting it an unqualified right to develop its property without limitation for five years after preliminary plat approval. The provision does nothing more than set a time limit for preliminary plats. No direct conflict exists because RCW 58.17.140 is silent on revocation.
The hearing examiner correctly decided revocation was the only remedy in this case because Respondent can never satisfy the conditions for final plat approval and conditions of preliminary plat approval. Respondent knowingly and deliberately violated conditions of preliminary plat approval which *1159 cannot be remedied. This particularly involved violation of prohibitions against removal of irreplaceable trees and vegetation in specified areas. Monetary fines and remediation methods cannot correct the violations committed by Respondent because the trees removed from the Oregon White Oak Preservation Area can never be restored to their original state.
We determine that the Pierce County Hearing Examiner had authority to revoke Respondent's preliminary plat under former PCC 18.50.975; that state platting laws do not preempt Pierce County from enacting the challenged revocation ordinance; that the revocation ordinance did not conflict with state platting laws; and that the hearing examiner correctly decided revocation was the only remedy.
ALEXANDER, C.J., IRELAND, OWENS, CHAMBERS, JJ., and BECKER J. Pro Tem., concur.
MADSEN, J. (dissenting).
The majority concludes that former Pierce County Code (PCC) 18.50.975 authorized revocation of HJS Development's preliminary plat approval on the grounds that the developer failed to comply with conditions of preliminary plat approval. However, the county's former land use regulations applicable to this case contain no such authority, and therefore I respectfully dissent.
The majority first concludes, and I agree, that former PCC 18.50.970, concerning revocation of "any site plan approval or permit" did not apply to preliminary plats because under the county code neither of these terms encompasses preliminary plat approval.
Former PCC 18.50.975 provided for revocation or modification of "any permit, use or activity granted pursuant to the Pierce County Zoning Code or allowed pursuant to the Underlying Zoning which shall include, but not necessarily be limited to, site plans related to special zones or unclassified use permits." The majority says, and again I agree, that former PCC 18.50.975, insofar as it concerns revocation of any "permit" or any "activity," did not apply to preliminary plats. Majority at 1151. The majority then reasons, however, that the term "use" in former PCC 18.50.975 did encompass preliminary plat approval. Majority at 1152. The majority notes that former PCC 18.50.145U.1 defined "`use'" as meaning "`development,'" among other things. Id. at 1152. "Development," in turn, was defined in part as "[a]ny change in the legal relationship of persons to land which materially affects development, such as: the division of land into two or more parcels or units to facilitate separate transfer of title to each parcel or unit." Former PCC 18.50.145D.3(B). The majority says that preliminary plat approval creates a change in the legal relationship of the owner or developer to the land that materially affects development, and thus preliminary plat approval is a "use" within the meaning of former PCC 18.50.975. Majority at 1153. I disagree.
Until a final plat is approved and filed, it is illegal to transfer or sell, or advertise for transfer or sale, any lot, tract, or parcel. RCW 58.17.200 (providing that prosecuting attorney "shall commence an action to restrain and enjoin further subdivisions or sales, or transfers, or offers of sale or transfer and compel compliance with all provisions of chapter 58.17 RCW).[1] The majority itself acknowledges that the right to subdivide arises from final plat approval. Majority at 1153; see RCW 58.17.170 ("[w]hen the legislative body of the city, town or county finds that the subdivision proposed for final plat approval conforms to all terms of the preliminary plat approval, ... other applicable state laws, and any [applicable] local ordinances," then it shall given final written approval "on the face of the plat"). And, "[f]inal approval cannot be granted if [the conditions to preliminary plat approval] are not met." Friends of the Law v. King County, 123 Wash.2d 518, 528, 869 P.2d 1056 (1994); see also, e.g., 18 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 5.4, at 271 (1995) (an applicant's inability or unwillingness to meet conditions for dedications or public improvements appear to be causes for denial of plat approval).
*1160 Preliminary plat approval does not authorize subdivision of land. As the majority says, "approval of a preliminary plat begins the plat subdivision process." Majority at 1153 (emphasis added). The majority also says that "the right to subdivide land arises from final plat approval." Id. (emphasis added). Thus, although preliminary plat approval is a significant stage in plat approval, in that it involves the actual decisions as to the terms and conditions of final plat approval, the majority itself necessarily recognizes that preliminary plat approval does not authorize subdivision.
Since there is no right to subdivide land merely upon preliminary plat approval, preliminary plat approval does not, and cannot, change the legal relationship of the owner or the developer to the land that materially affects development. Therefore, while preliminary plat approval is an important part of the approval process, it does not come within the definition of "development" in former PCC 18.50.145D.3(B), and thus it not within the meaning of "use" in former PCC 18.50.145U.1. Preliminary plat approval therefore does not fall within the revocation authority stated in former PCC 18.50.975.
The majority's statement that its conclusion is consistent with former PCC § 18.50.975's limitation on revocation, i.e., that a use may be revoked only when granted pursuant to the county zoning code or underlying zoning, is also unfounded. The majority refers to the applicable zoning law specifying developments and uses permitted, noting that former PCC 18.50.185 divided them into three categories. Majority at 1153. The majority then says that former PCC 18.50.185(C)(1)[2] expressly considered a subdivision a permitted use under the zoning code, "[l]ike the statutory definition." Majority at 1153-1154.
However, while a subdivision may be a permitted use under the zoning code, the majority's equation of preliminary plat approval to a subdivision as the term is used in former PCC 18.50.185 suffers from the same flaw as its main analysis. That is, while a subdivision can involve land that has been divided into parcels for the transfer of title to each parcel, as the statutory definition of "development" in former PCC 18.50.145(D).3(B) contemplates, a preliminary plat cannot. Therefore, I do not find persuasive the majority's attempt to reinforce its conclusion by equating the zoning code to the ordinance's definition of "development."
Finally, I note that Pierce County maintains, in an argument directed at whether state law preempts any local ordinances respecting revocation, that the authority to revoke is implied in state law. It is not necessary to reach the question of preemption, since the local ordinances did not, in any event, purport to authorize revocation of preliminary plat approval.
In contrast to the majority, I would hold that none of the express revocation provisions in Pierce County's former land use regulations applies to authorize revocation of HJS Development's preliminary plat approval. Accordingly, the superior court's decision should be affirmed.
SANDERS, J., concurs.
NOTES
[*] Judge Charles Z. Smith is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a).
[1] Fox Ridge Investments filed the preliminary plat and site plan application. Respondent HJS Development, Inc., is the property owner. Both entities are the same party Respondent on this appeal.
[2] Under RCW 58.17.033(2), [t]he requirements for a fully completed application shall be defined by local ordinance. Appellant acknowledges Respondent filed a complete application for plat approval.
[3] Clerk's Papers at 37. The Gig Harbor Peninsula Development Regulations, which regulated development of all property on the Gig Harbor Peninsula in unincorporated Pierce County, former chapter 18.50 of the Pierce County Code, required proposed plats to be processed with a site plan in the Rural-Residential Environment.
[4] Id.
[5] Clerk's Papers at 181.
[6] In 1989 the Pierce County Council amended the comprehensive plan and the Gig Harbor Peninsula Development Regulations and adopted the Rural-Residential Environment of the Gig Harbor Peninsula Comprehensive Plan which included essentially all of Fox Island.
[7] The Pierce County Comprehensive Plan became effective on January 1, 1995.
[8] Clerk's Papers at 37.
[9] Id. at 249-50 (emphasis added).
[10] Id. at 140, 198. Former PCC 21.14.030(c)(2), "Geologically Hazardous Areas" Ordinance states: "The development proposal may be approved, approved with conditions or denied based [upon] the Department's evaluation of the ability of the proposed mitigation measures to reduce risks associated with the erosion and landslide hazard area."
[11] Id. (citing Administrative Record at 819).
[12] Id.
[13] Id. (citing Administrative Record at 822-23).
[14] Id. (citing Administrative Record at 826-28). Appellant's brief cites the report in stating "Selective clearing is considered to be acceptable with the 50 foot BSBL [building setback and buffer line] for the purpose of creating lawns and landscaped areas. Selective clearing is defined herein to mean the removal of small trees, bushes and other low-lying vegetation and the removal of dead, diseased or dangerous trees. No trees greater than 36 inches in diameter at breast height (dbh) occurring within the BSBL or upon adjacent steep slopes shall be removed with the exception of dead, diseased or dangerous trees."
[15] Clerk's Papers at 198.
[16] See id. (noting former § PCC 21.14.030(c)(2)) "Geologically Hazardous Areas" and former PCC 21.20.080.D "Critical Areas and Natural Resource Land Authority and Purpose."
[17] Id.
[18] Id. at 201.
[19] Id.
[20] Id. at 202 (emphasis added).
[21] Id.
[22] Id.
[23] Id. at 203-04.
[24] Id. at 175.
[25] Id. at 175-76.
[26] Id. at 174-95.
[27] Verbatim Report of Proceedings (VRP) of Recorded Hearing Before Hearing Examiner Stephen K. Causseaux, Jr. (Feb. 5, 1998) at 3-8.
[28] VRP at 5.
[29] Id.
[30] Id. at 9-18.
[31] Id.
[32] Clerk's Papers at 174-95. The hearing examiner's decision adopted all of the MDNS mitigated measures as conditions of approval.
[33] VRP (Oct. 4, 2000) at 6.
[34] Id.; Clerk's Papers at 208.
[35] Clerk's Papers at 208.
[36] VRP (Oct. 4, 2000) at 6.
[37] Id. at 128.
[38] Id. at 18, App. C.
[39] Clerk's Papers at 208.
[40] Id.
[41] See Title 18(h) PCC and chapter 76.09 RCW.
[42] Clerk's Papers at 208. Two Fox Island residents also filed a petition for revocation of the preliminary plat.
[43] See VRP (Oct. 4, 2000).
[44] Clerk's Papers at 209.
[45] Id.
[46] Clerk's Papers at 212.
[47] Id. at 231.
[48] Id.
[49] Id. at 64.
[50] PCC 1.22.130 authorizes the examiner to "take such further action as is deemed proper"; Rule 1.11 of the Rules of Procedure for Hearings authorizes reopening of a hearing "for good cause shown" or in the "interest of justice."
[51] Clerk's Papers at 70.
[52] Id. at 4.
[53] Id. at 79-124.
[54] VRP (June 7, 2001).
[55] The court did not address the moratorium issue. VRP (June 7, 2001) at 25-28.
[56] VRP (June 7, 2001) at 104-06.
[57] Id. at 106.
[58] Id. at 109.
[59] Notice of Appeal to Washington State Supreme Court, Number 71430-4 (Aug. 2, 2001).
[60] Order Granting Review (July 1, 2002).
[61] See RCW 36.70C.030 which provides specific exceptions; Chelan County v. Nykreim, 146 Wash.2d 904, 916-17, 52 P.3d 1 (2002).
[62] See Citizens to Preserve Pioneer Park v. City of Mercer Island, 106 Wash.App. 461, 470, 24 P.3d 1079 (2001); RCW 36.70C.130(1), .020(1).
[63] RCW 36.70C.130(1).
[64] Citizens, 106 Wash.App. at 470, 24 P.3d 1079.
[65] King County v. Boundary Review Bd., 122 Wash.2d 648, 672, 860 P.2d 1024 (1993) (citing Sherman v. Moloney, 106 Wash.2d 873, 881, 725 P.2d 966 (1986); Farm Supply Distribs., Inc. v. Wash. Utils. & Transp. Comm'n, 83 Wash.2d 446, 448, 518 P.2d 1237 (1974); Schmitt v. Cape George Sewer Dist. 1, 61 Wash.App. 1, 4, 809 P.2d 217 (1991)).
[66] See City of Univ. Place v. McGuire, 144 Wash.2d 640, 647, 30 P.3d 453 (2001); Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999) (citing Boundary Review Bd., 122 Wash.2d at 672, 860 P.2d 1024; Hilltop Terrace Homeowner's Ass'n v. Island County, 126 Wash.2d 22, 29, 891 P.2d 29 (1995)).
[67] See RCW 58.17.010; Norco Const. Inc. v. King County, 29 Wash.App. 179, 180, 627 P.2d 988 (1981).
[68] See RCW 58.17.030, .070.
[69] RCW 58.17.020(4).
[70] RCW 58.17.100; Norco Const. Inc., 29 Wash. App. at 180, 627 P.2d 988.
[71] See RCW 58.17.100; PCC 16.08.020.
[72] PCC 16.08.020.
[73] Norco Const. Inc., 29 Wash.App. at 181, 627 P.2d 988.
[74] It is well established that if a case can be decided on nonconstitutional grounds, an appellate court should decline to consider the constitutional issues. See Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wash.2d 740, 49 P.3d 867, 874 (2002); State v. Speaks, 119 Wash.2d 204, 207, 829 P.2d 1096 (1992).
[75] Former PCC 18.50.970 and 18.50.975 (emphasis added). Standards for revocation established in the ordinance, former PCC 18.50.995, stated in part:

Such revocation or modification shall be made on any one or more of the following grounds:
. . . .
D. That the permit or variance granted is being, or recently has been, exercised contrary to the terms or conditions of such approval, or in violation of any Statute, Resolution, Cod, Law or Regulation;
E. That the use for which the approval was granted was so exercised as to be detrimental to the public health or safety, or so as to constitute a nuisance.
[76] See Burley Lagoon Improvement Ass'n v. Pierce County, 38 Wash.App. 534, 540, 686 P.2d 503 (1984). In the city of Seattle, site plan permits are master use permits (MUPs) employed to streamline the regulatory review process. MUPs include a number or regulatory components such as environmental impact review, comprehensive plan review, and other use inquires. See, e.g., Erickson & Assocs., Inc. v. McLerran, 123 Wash.2d 864, 872 P.2d 1090 (1994). In the revocation hearing, the Pierce County Planning and Land Services Department requested the hearing examiner to consider revocation of the site plan for violations of the plat's conditions of approval. Clerk's Papers at 36.
[77] Br. of Resp't (citing former PCC 18.50.960) (emphasis added).
[78] Clerk's Papers at 231.
[79] Brister v. Council of Tacoma, 27 Wash.App. 474, 476, 619 P.2d 982 (1980) (treating site plan and plat approval as separate processes). Although neither party defines site plan, it is unlikely to be confused with binding site plan. As defined by statute, a binding site plan is an alternative method in dividing land and exempted from the platting requirements of chapter 58.17 RCW. It is similar to a preliminary plat in that it requires a drawing to scale to subdivide land, but it is only applicable in three types of land uses: (1) commercially or industrially zoned property; (2) mobile home or travel trailer sites; and (3) condominium development. This case, involving single-family dwellings in a rural-residential zone, does not come within this definition.
[80] Lejeune v. Clallam County, 64 Wash.App. 257, 270, 823 P.2d 1144 (1992)."
[81] See McTavish v. City of Bellevue, 89 Wash. App. 561, 565, 949 P.2d 837 (1998): Brister, 27 Wash.App. at 476, 619 P.2d 982.
[82] World Wide Video, Inc. v. City of Tukwila, 117 Wash.2d 382, 392, 816 P.2d 18 (1991), cert. denied, 503 U.S. 986, 112 S.Ct. 1672, 118 L.Ed.2d 391 (1992).
[83] Heinsma v. City of Vancouver, 144 Wash.2d 556, 563, 29 P.3d 709 (2001).
[84] State v. Villarreal, 97 Wash.App. 636, 641, 642, 984 P.2d 1064 (1999); McTavish v. City of Bellevue, 89 Wash.App. 561, 565, 949 P.2d 837 (1998).
[85] Burley Lagoon Improvement Ass'n, 38 Wash. App. at 536, 686 P.2d 503 (citing N. Pac. Coast Freight Bureau v. State, 12 Wash.2d 563, 122 P.2d 467 (1942)).
[86] Burley Lagoon Improvement Ass'n, 38 Wash. App. at 537, 686 P.2d 503 (citing State ex rel. Spokane United Rys. v. Dep't of Pub. Serv., 191 Wash. 595, 71 P.2d 661 (1937)).
[87] Burley Lagoon Improvement Ass'n, 38 Wash. App. at 538, 686 P.2d 503.
[88] Former PCC 18.50.145A.2.
[89] Respondent contends "permits" under the code does not refer to or make mention of preliminary plats. Instead the code specifies "use permits" for "conditional use," "unclassified use," and "nonconforming use" of the property and "building permits" and "site development permits" for development of the property, citing former PCC 18.203.050, 18.10.221.010, 18.10.610(I, N), .630(C, D), .680(B), .700(A)(1),.145U.2; PCC 17A.10.07(1).
[90] King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 554, 14 P.3d 133 (2000) ("preventing interference with agricultural activities by nearby non-agricultural land uses.").
[91] See former PCC 18.203.050, 18.10.221.010, 18.10.610(I, N), .630(C, D), .680(B), .700(A)(1),.145U.2; PCC 17A.10.070.
[92] Former PCC 18.50.145U.1, .145D.3.
[93] See id.
[94] Ordinarily, the word "or" does not mean "and" unless there is clear legislative intent to the contrary. See State v. Tiffany, 44 Wash. 602, 87 P. 932 (1906). Statutory phrases separated by the word "and" generally should be construed in the conjunctive. See 1A Norman J. Singer, Statutes and Statutory Construction § 21:14, at 179-81 (6th ed.2002).
[95] Former PCC 18.50.145D.3.
[96] See id.
[97] See, e.g., King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 550, 14 P.3d 133 (2000); Citizens for Mount Vernon v. City of Mount Vernon, 133 Wash.2d 861, 947 P.2d 1208 (1997); Christianson v. Snohomish Health Dist., 133 Wash.2d 647, 946 P.2d 768 (1997).
[98] Br. of Resp't at 24.
[99] See RCW 58.17.140, .150, .160, .170.
[100] See RCW 58.17.170.
[101] 6 WASH. STATE BAR ASS'N, REAL PROPERTY DESKBOOK § 89.5(2) (1996).
[102] See Loveless v. Yantis, 82 Wash.2d 754, 763, 513 P.2d 1023 (1973) (a preliminary plat approval constitutes a major action significantly affecting the environment, necessitating an environmental impact statement).
[103] See RCW 58.17.170.
[104] Former PCC 18.50.975 (emphasis added).
[105] Clerk's Papers at 36; former PCC 18.50.180,.185.
[106] "(A) Developments or uses permitted outright;

(B) Development or uses permitted after administrative review and approval of a site plan by the Planning Department; and (C) Development or uses permitted after review and approval of a site plan by the Examiner after at least one public hearing." Former PCC 18.50.185.
[107] Former PCC 18.50.185(C)(1) stated in part:

1. Any use or activity which requires a public hearing or public meeting.... In the event any use or activity requires approval over and beyond the requirements of this Regulation and the Examiner has the authority to review the matter under the other Regulations or Code, the Examiner may consider the separate applications concurrently.... This Section shall be applicable, but not necessarily limited to, subdivisions....
[108] CONST. art. XI, § 11.
[109] See Rabon v. City of Seattle, 135 Wash.2d 278, 287, 957 P.2d 621 (1998); Brown v. City of Yakima, 116 Wash.2d 556, 559, 807 P.2d 353 (1991).
[110] Lenci v. City of Seattle, 63 Wash.2d 664, 667-68, 388 P.2d 926 (1964) (citing In re Iverson, 199 Cal. 582, 250 P. 681 (1926)).
[111] Rabon, 135 Wash.2d at 289, 957 P.2d 621; Brown, 116 Wash.2d at 560, 807 P.2d 353.
[112] Brown, 116 Wash.2d at 560, 807 P.2d 353; Lenci, 63 Wash.2d at 669-70, 388 P.2d 926.
[113] Lenci, 63 Wash.2d at 667-68, 388 P.2d 926 (citing Letterman v. City of Tacoma, 53 Wash.2d 294, 333 P.2d 650 (1958)).
[114] Id. (citing Winkenwerder v. City of Yakima, 52 Wash.2d 617, 328 P.2d 873 (1958)).
[115] Former PCC 18.50.975.
[116] See VRP at 104 (June 7, 2001).
[117] RCW 58.17.010 (emphasis added).
[118] City of Seattle v. Williams, 128 Wash.2d 341, 359-60, 908 P.2d 359 (1995).
[119] Id. at 347-48, 908 P.2d 359.
[120] Id. at 349-50, 908 P.2d 359.
[121] Id. at 363, 908 P.2d 359.
[122] Id. at 353, 908 P.2d 359.
[123] See RCW 58.17.100.
[124] Br. of Resp't at 27.
[125] See Oliver v. Harborview Med. Ctr., 94 Wash.2d 559, 565, 618 P.2d 76 (1980).
[126] Trimen Dev. Co. v. King County, 124 Wash.2d 261, 270, 877 P.2d 187 (1994); Rabon v. City of Seattle, 135 Wash.2d 278, 291, 957 P.2d 621 (1998).
[127] See RCW 58.17.100, .110. See also Isla Verde Int'l Holdings v. City of Camas, 146 Wash.2d 740, 49 P.3d 867, 880 (2002) ("[L]ocal governments have the authority to adopt regulations or to withhold plat approval if appropriate provisions have not been made ... "); Norco Constr., 29 Wash.App. at 180, 627 P.2d 988.
[128] Id.
[129] Former PCC 18.50.995.
[130] See RCW 58.17.100, .110 (allowing enactment of regulations for the public health, safety, and general welfare).
[131] Lenci, 63 Wash.2d at 670, 388 P.2d 926.
[132] Heinsma, 144 Wash.2d at 565, 29 P.3d 709 (citing Brown, 116 Wash.2d at 561, 807 P.2d 353).
[133] Heinsma, 144 Wash.2d at 565, 29 P.3d 709.
[134] Rabon, 135 Wash.2d at 292, 957 P.2d 621 (citing Trimen Dev. Co., 124 Wash.2d at 269, 877 P.2d 187; City of Bellingham v. Schampera, 57 Wash.2d 106, 110-111, 356 P.2d 292 (1960)).
[135] Br. of Resp't at 31, 32.
[136] See RCW 58.17.140.
[137] Id.
[138] Friends of the Law, 123 Wash.2d at 522, 869 P.2d 1056; RCW 58.17.030.
[139] See RCW 58.17.100, .110.
[140] See RCW 58.17.110.
[141] Boundary Review Bd., 122 Wash.2d at 672, 860 P.2d 1024.
[142] See McGuire, 144 Wash.2d at 647, 30 P.3d 453; Girton, 97 Wash.App. at 363, 983 P.2d 1135 (citing Boundary Review Bd., 122 Wash.2d at 672, 860 P.2d 1024; Hilltop Terrace Homeowner's Ass'n, 126 Wash.2d at 29, 891 P.2d 29).
[143] Clerk's Papers at 212-13.
[1] Under RCW 58.17.205, an offer or agreement to sell, lease, or transfer a lot, tract, or parcel of land that is expressly conditioned on recording of the final plat is not subject to RCW 58.17.200's injunctive action.
[2] That code provision states in relevant part:

"Developments or uses permitted after review and approval of a site plan by the Examiner after at least one public hearing are as follows:
"1. Any use ... which requires a public hearing or public meeting according to any other law, ordinance, regulation, or Code.... This Section shall be applicable, but not necessarily limited to ... subdivisions...."
Former PCC 18.50.185(C)(1).