43 P.3d 1250 (2002)
111 Wash.App. 152
Earl L. MILLER and Linda Miller, Respondents,
v.
CITY OF BAINBRIDGE ISLAND and Eagle Harbor Alliance, Appellants.
No. 26367-0-II.
Court of Appeals of Washington, Division 2.
April 12, 2002.
*1251 Rosemary Larsen, Rod Kaseguma, Bellevue, Carol Ann Morris, Bainbridge Island, David A. Bricklin, Seattle, for Appellants.
Margaret Archer, William T. Lynn, Tacoma, for Respondents.
QUINN-BRINTNALL, A.C.J.
Business owners Earl and Linda Miller sought a permit to rebuild their business and pier after fire destroyed the structures. The property was zoned residential, but Miller claimed that the property enjoyed a legal nonconforming use at the time of the fire. The City of Bainbridge Island denied the permit, claiming the original nonconforming use (concrete casting and supply) had lapsed. The Millers and Eagle Harbor Alliance (EHA) appealed, and the land use examiner affirmed. The Millers and EHA then appealed to superior court. The superior court reversed the land use examiner's decision, and the City and EHA now appeal. Because Miller has not demonstrated that his use at the time of the fire was a lawful nonconforming use, we reinstate the examiner's decision.

*1252 FACTS
On January 9, 1997, Miller's large commercial building and pier located on Eagle Harbor on Bainbridge Island were totally destroyed by fire. The very large building was built partially over the water and originally housed a strawberry processing plant, owned and operated by first and second generation Japanese in the 1930s and early 1940s until the owners and workers were interned. The building has been known ever since as the Strawberry Plant.
STRAWBERRY PLANT'S USE HISTORY
The record shows that the Strawberry Plant changed ownership and housed various tenants over the decades. From around the end of the second world war until 1968, Weaver's Concrete Supply operated in the building. From 1964 to early- to mid-1973, the building was also home to a pre-stressed concrete casting business operated by the building's then owner, J.A. Park.
The City of Winslow annexed the property in 1963 and enacted a zoning code. But the Strawberry Plant was not included in that zoning plan.[1] In 1969, Winslow enacted a new zoning code that included the Strawberry Plant property and zoned the property as residential. At that time, the only use of the building was Park's concrete supply business.
ZONING LAW OF 1969
In 1969, Winslow passed a zoning code that for the first time included the Strawberry Plant. The property was designated single family residential. The zoning code allowed the continuance of nonconforming uses, but a use could not be resumed if discontinued for either 6 consecutive months or 18 total months in three years. A legal nonconforming use could be changed to another use if approved by the Board of Adjustment:
A non-conforming use of a structure may be continued, provided that: a) The structure is not enlarged.... b) It may be changed to another non-conforming use by the Board of Adjustment if the proposed use is not less appropriate.... d) If it is discontinued for a period of six consecutive months or for 18 months in any three year period; it may not thereafter be resumed.
Clerk's Papers at 503.
The Strawberry Plant clearly did not qualify as residential; therefore, in 1969, the Strawberry Plant's then-current uses became legal nonconforming uses.
LAND USE HEARING
The hearing examiner found that Park's pre-stressed concrete casting business was an on-going commercial business on the subject property at the time of the adoption of the 1969 Code. She also found that the concrete business was a legal nonconforming use of the Strawberry Plant under the 1969 zoning code, but the concrete business use was discontinued in 1973 and never resumed. Miller assigned error to this finding in his petition to the superior court, stating:
The Hearing Examiner erred in making Finding of Fact No. 17 because there is no evidence in the record to support this finding. Miller agrees that J.A. Park[] ceased operation of his business in approximately 19[7]3, however, there is no evidence that the nonconforming use was discontinued in 1973 in light of the fact that other operations continued in the building after J.A. Park[] ceased his operations.
Clerk's Papers at 1162.
James Phillips testified that he owned the property from 1975 to 1995. His company (Washington Acoustical) used it as an office, warehouse, and for development planning. Phillips rented the rest of the space to various tenants, who used it for office, storage, workplaces, and shops.
In 1982, neighbors brought a nuisance action against one of the Strawberry Plant's tenants, Joe Haley, a helicopter-flying rockery contractor who owned Island Marine Construction. Phillips owned the Strawberry Plant at the time and intervened in the nuisance action. The City ordered Island Marine to cease its illegal use of the property (namely, the helicopter flying and heavy construction), *1253 and the hearing examiner affirmed, concluding that Island Marine's use was not a legal nonconforming use. The hearing examiner did not address the legality of the other tenants' various uses specifically, but did conclude that
There has been no showing that any commercial or industrial use of the property existing in June, 1979[[2]], was itself a valid non-conforming use under the prior zoning ordinance ... which also zoned the property for residential use, and hence no use has been proven capable of transferring non-conforming status.
Clerk's Papers at 439. At the hearing in this case, the EHA argued the decision in the nuisance action had preclusive effect on Miller's case, but the hearing examiner refused to apply the 1982 decision to this action.
Phillips testified that during his 20 years of owning the Strawberry Plant, the City issued business licenses, building permits, and so forth to his tenants. Within a year or so of the Island Marine case, Phillips overhauled the roof with the City's permission. But the City never discussed the uses Phillips and his tenants were making of the property before the fire, except in the context of the Island Marine nuisance case.
Miller purchased the Strawberry Plant property in April 1996 after extensive discussion with the City about his plans for the property. At that time, the building housed a mix of warehouse, commercial, light manufacturing, and office uses.[3] At the time of the fire, the Strawberry Plant's rent roll listed 27 tenants.
CITY'S REPRESENTATIONS REGARDING USE
In addition to the City's order requiring Island Marine to discontinue its illegal use, Miller claims that the City made various representations regarding the feasibility of his upgrading the property about the time Miller was considering purchasing the building. In correspondence dated May 30, 1995, to the City's planning director, Miller's agent, William Palmer, referenced a meeting Miller had recently had with the mayor to discuss Miller's "concept for improving the large building found on the site as well as the grounds around it." Clerk's Papers at 809. According to Miller's letter, the mayor's response to this plan "was positive." Clerk's Papers at 809. The purpose of the letter was to request a meeting to discuss further clarification of the uses allowed on the Strawberry Plant property. The record does not include the director's reply to this letter, if any.
Approximately two months later, planner George Johnston wrote Miller to discuss the pre-application process for a permit to renovate the property. First, Johnston explained that under the City's municipal code, a legal nonconforming use may be changed only after a hearing: "[I]n order to change the use of the building entirely to office/professional, a public hearing must be conducted and a decision rendered by the Hearing Examiner." Clerk's Papers at 811. Johnston also listed other necessary steps, such as a State Environmental Policy Act (SEPA) review, site plan review, and approval from the Fisheries Department. Finally, Johnston explained
[t]he City recognizes the positive elements of your proposal, in particular, rebuilding the structure to meet fire and safety codes as well as restoring the shoreline. However, to avoid any type of planning permit review, you are only allowed to continue the present uses, not enlarge them....
Clerk's Papers at 811 (emphasis added).
In his September 12, 1995 letter to the mayor, Miller (through his agent, Palmer) characterized the then-current use of the property as "light manufacturing activity and... outside materials storage...." Clerk's Papers at 813. After renovation it would be *1254 an office park. Palmer acknowledged in the letter that the planning department staff felt "that the scope of Mr. Miller's project is beyond what can be accomplished by `fix-up and repair' of an existing non-conforming use" and that the staff had encouraged Miller to pursue a re-classification of the Strawberry Plant property. Clerk's Papers at 813-14. The letter then laid out the virtues of such a re-classification.
This correspondence took place before the Strawberry Plant burned. After the fire, Miller applied for a re-build permit in May 1998. The City's Planning and Community Development Department denied the application by letter dated February 9, 1999, stating that there were no legal nonconforming uses of the Strawberry Plant building at the time of the fire.
EAGLE HARBOR ALLIANCE'S APPEALS
The Eagle Harbor Alliance is a citizens' group made up of property owners whose property is located next to or near the Strawberry Plant site. It appealed the City's decision because it contends even more reasons support denying Miller's permit application than those given by the City. These reasons include Miller's failure to provide a SEPA checklist with his permit application and the res judicata effect of the 1982 Island Marine decision regarding the illegal nonconforming uses of the Strawberry Plant at that time. The EHA also claimed that the City should have denied the permit under its zoning code instead of under the Shoreline Management Program.
LAND USE HEARING AND PROCEDURAL HISTORY
Miller (and EHA) appealed to the hearing examiner, who held hearings March 18, 1999, and April 1, 1999. At the hearings, Miller sought to admit a 1983 letter from the City to Miller's predecessor, Phillips, in response to Phillips' request for clarification of the then-current uses for the building and his application for a permit to re-roof the building. Miller claimed that the letter would establish that the City ruled in 1983 that the then-current uses were legal. The City objected to the admission of the letter, claiming lack of foundation because the letter did not mention the property by name and referenced an earlier letter from Phillips to the City, which Miller could not produce. Phillips testified that he did not own any commercial property other than the Strawberry Plant at the time the letter was written. Additionally, the address on the letter matched Phillips' business address at the time, and he produced the permit (to repair the roof) and fee receipt referenced in the letter. The hearing examiner sustained the City's objection to the letter, explaining "it seems you are trying to introduce this as a statement of legally finding [sic] interpretation by the City of Winslow on their code at the time, and I don't think it rises to that degree of formality." Clerk's Papers at 681.
The hearing examiner affirmed the City's denial of Miller's permit application, and Miller and the EHA filed separate appeals to the Kitsap County Superior Court. The parties agreed to consolidate the two cases on appeal. The superior court reversed, holding that the hearing examiner erred in (1) determining that there were no legal nonconforming uses at the time of the fire; (2) improperly placing the burden to prove a legal nonconforming use on Miller; and (3) improperly excluding the 1983 letter. The City and EHA appealed that decision to this court.

ANALYSIS
On review of a land use decision that presents mixed questions of law and fact, we determine the law independently and apply it to the facts as found by the hearing examiner. See Clarke v. Shoreline Sch. Dist. No. 412, 106 Wash.2d 102, 109-11, 720 P.2d 793 (1986); Franklin County Sheriff's Office v. Sellers, 97 Wash.2d 317, 330, 646 P.2d 113 (1982). We review administrative actions on the administrative, not superior court, record. Waste Mgmt. of Seattle, Inc. v. Utilities & Transp. Comm'n, 123 Wash.2d 621, 632, 869 P.2d 1034 (1994).
The Land Use Petition Act (LUPA) provides the statutory standard of review of land use petitions. See ch. 36.70C RCW. Under RCW 36.70C.130, a reviewing court may grant relief from a land use decision if the petitioner carries its burden of establishing that (a) the examiner engaged in unlawful *1255 procedure or failed to follow a prescribed process (unless the error was harmless), (b) the decision is an erroneous interpretation of the law, (c) the decision is not supported by substantial evidence in light of the whole record, (d) the decision is a clearly erroneous application of the law to the facts, (e) the decision is outside the authority or jurisdiction of the hearing examiner, or (f) the decision violates the constitutional rights of the party seeking relief. RCW 36.70C.130(1). In his appeal to the superior court, Miller argued that (b), (c), and (d) applied.
We apply the standards of RCW 36.70C.130 based on the record created before the hearing examiner. Westside Bus. Park, LLC v. Pierce County, 100 Wash.App. 599, 602-03, 5 P.3d 713, review denied, 141 Wash.2d 1023, 10 P.3d 1075 (2000) (citing RCW 36.70C.120(1); 36.70C.130(1)). We defer to the hearing examiner on factual determinations and, under subsection (c) above, we will not overturn the examiner's findings of fact unless they are not supported by evidence that is substantial in view of the entire record before the examiner. RCW 36.70C.130(1)(c); Isla Verde Int'l Holdings, Inc. v. City of Camas, 99 Wash.App. 127, 133-34, 990 P.2d 429 (1999), review granted, 141 Wash.2d 1011, 10 P.3d 1071 (2000).
The hearing examiner found that the concrete casting business was an on-going commercial business and became a legal nonconforming use of the land and building when the code was adopted in 1969. The hearing examiner further found that "[t]his non-conforming use was discontinued in 1973 and has not been resumed." Clerk's Papers at 503. Substantial evidence supports this finding.
The relevant date for determining the initial nonconforming use was 1969, when the zoning code was enacted. But at the time of the fire in 1998, that legal nonconforming use had been discontinued for 25 years. A legal nonconforming use cannot be transferred to some other type of use without the Board of Adjustment's express permission. No such permission was requested or given. And representations or conduct on the part of City officials did not amount to Board approval.
Because we agree that no lawful nonconforming use existed after 1973, we reverse the superior court and reinstate the hearing examiner's ruling that the City properly denied Miller's request for a rebuild permit. We need not reach the issues raised by EHA.
DEFINING THE NONCONFORMING USE AND ASSIGNING BURDEN OF PROOF
Miller correctly states that the parties do not dispute that after Park closed his concrete casting business in 1973, the Strawberry Plant was continuously occupied and used by various commercial tenants until the fire. But as the City and the EHA argue, in 1969 the proper date for determining the legal nonconforming use under the 1969 zoning law the only use of the property was as a concrete casting business.
The hearing examiner found that the concrete casting business was the legal nonconforming use established in 1969 and "[t]his non-conforming use was discontinued in 1973 and has not been resumed." Clerk's Papers at 503. In challenging this finding, Miller attempts to broaden the scope of the nonconforming concrete casting use by calling it generically "commercial" and then to designate the other uses of the property at the time the concrete casting use ceased as the significant uses at issue. Specifically, Miller characterizes the issue as "whether tenant changes from 1973 forward constituted a discontinuance or abandonment of the lawful nonconforming use established in 1969." Br. of Respondent at 30-31. His analysis is flawed for two reasons. First, Miller defines the 1969 use much too broadly by calling it "commercial." Second, 1969the year of the zoning code's enactmentnot 1973, is the proper date for determining the legality of a nonconforming use of the property.
A nonconforming use is defined in terms of the property's lawful use established and maintained at the time the zoning was imposed. Meridian Minerals Co. v. King County, 61 Wash.App. 195, 207, 810 P.2d 31 (1991). In 1969, that lawful nonconforming use was a concrete casting supply business.
*1256 A nonconforming use in existence when a zoning ordinance is enacted cannot be changed into some other kind of a nonconforming use. Coleman v. City of Walla Walla, 44 Wash.2d 296, 300-01, 266 P.2d 1034 (1954) (nonconforming rooming house cannot be changed to fraternity house). See, also, Open Door Baptist Church v. Clark County, 140 Wash.2d 143, 150-51, 995 P.2d 33 (2000) (legal nonconforming use as church could not be resumed after intervening years as art school); Shields v. Spokane Sch. Dist. No. 81, 31 Wash.2d 247, 255, 196 P.2d 352 (1948) (nonconforming elementary school cannot change to trade school).
Miller claims that the hearing examiner erred in requiring himinstead of the City to prove the continued existence of the nonconforming use, citing Van Sant v. City of Everett, 69 Wash.App. 641, 849 P.2d 1276 (1993). The City counters that "[t]he Millers cannot avoid their burden to prove that the office uses at the time of the fire were legal nonconforming uses, by pointing to a different use that existed thirty years ago." Br. of Appellant (City) at 30.
Miller is correct that once he establishes the legal nonconforming use, the burden to prove abandonment would shift to the City. See Van Sant, 69 Wash.App. at 649, 849 P.2d 1276. But when an ordinance establishes a set time beyond which a nonconforming use cannot remain unused without being forfeited, the burden shifts back to the owner to prove lack of intent to abandon: "If the ordinance references a time frame ... a rebuttable presumption arises that the land occupier has intended to abandon the nonconforming use." Skamania County v. Woodall, 104 Wash.App. 525, 540-41, 16 P.3d 701, review denied, 144 Wash.2d 1021, 34 P.3d 1232 (2001), cert. denied, 70 U.S.L.W. 3444 (U.S. April 1, 2002) (No. 01-958). See also Andrew v. King County, 21 Wash.App. 566, 572, 586 P.2d 509 (1978) (the cessation of a use for the period prescribed by the zoning code is prima facie evidence of an intent to abandon the nonconforming use).
Neither side disputes that the cement plant was a nonconforming use established when the zoning code first mentioned the Strawberry Plant property in 1969. It is also undisputed that the concrete casting business discontinued in 1973 and was never resumed.[4] At the hearing, the initial burden was on Miller to prove his use at the time of the fire was a lawful nonconforming use in 1969. Substantial evidence in the record clearly supports the hearing examiner's determination that Miller failed to sustain his burden on this issue, and it is affirmed.
WHETHER CITY APPROVED CHANGES IN USES
Under the City's zoning code, a legal nonconforming use could be changed to another use if approved by the Board of Adjustment. Miller claims that his evidence "demonstrates, at least by implication, that the City authorized, or at least ratified the changes...." Br. of Respondent at 45. But neither Miller nor his predecessors sought approval for any change in use from the Board of Adjustment; therefore, their changes were unauthorized and are not legal uses.
Any failure by the City to enforce its zoning code or any representations the City made that the uses at the Strawberry Plant were legal do not constitute approval by the Board of Adjustment. Acts done without legal authorization or in direct violation of existing statutes are ultra vires. Dykstra v. Skagit County, 97 Wash.App. 670, 677, 985 P.2d 424 (1999), review denied, 140 Wash.2d 1016, 5 P.3d 8 (2000). In Dykstra, the property owners challenged the county's denial of their permits when the county had previously granted exemptions to other owners of substandard lots. The court explained that governmental entities are not precluded from enforcing ordinances, even when they have been improperly enforced in the past:
The governmental zoning power may not be forfeited by the action of local officers in disregard of the statute and the ordinance.

*1257 The public has an interest in zoning that cannot thus be set at naught. The plaintiff landowner is presumed to have known of the invalidity of the exception and to have acted at his peril.
Dykstra, 97 Wash.App. at 677, 985 P.2d 424 (quoting City of Mercer Island v. Steinmann, 9 Wash.App. 479, 483, 513 P.2d 80 (1973)) (quoting V.F. Zahodiakin Eng'g Corp. v. Zoning Bd. of Adjustment of City of Summit, 8 N.J. 386, 86 A.2d 127, 132 (Sup. Ct.1952)). Hereregardless of the City's actionsthere was no express approval by the Board of Adjustment Therefore any uses different from the legal nonconforming use of concrete casting was an unlawful nonconforming use.
EXCLUSION OF 1983 LETTER FROM CITY TO PHILLIPS
Miller argues that it was "reversible error" for the hearing examiner to exclude the 1983 letter from the City to Phillips and "to give little weight to the fact that the local government had [by this letter] previously recognized a nonconforming use of the property at issue." Br. of Respondent at 46. But Miller cites Van Sant, 69 Wash.App. at 648-49, 849 P.2d 1276, in support of his claim. Van Sant only observed that the hearing examiner in that case "seemed to give little weight" to the City's previous authorization of a nonconforming use. Van Sant, 69 Wash.App. at 648-49, 849 P.2d 1276. But the "reversible error" in Van Sant was the hearing examiner's misallocation of the burden of proof, not the hearing examiner's failure to defer to a previous City interpretation of its zoning laws. See Van Sant, 69 Wash.App. at 648-49, 849 P.2d 1276.
More importantly, the letter does not help Miller's case much. Read broadly, the letter refers to uses in only one sentence: "The use of the existing warehouse is a legal nonconforming use which may continue as long as it is not enlarged or altered so as to increase its non-conformity." Clerk's Papers at 496. But Miller seeks a permit to build an office park. At best this letter establishes that in 1983 a City employee viewed the legal nonconforming use to be a warehouse. Even if the hearing examiner had admitted this evidence, she could not have found that Miller's claimed office and commercial use at the time of the fire was the equivalent of the warehouse use noted in the 1983 letter or the cement plant in 1969. Excluding the letter was not error and resulted in no prejudice to Miller.
PRECLUSIVE EFFECT OF EARLIER NUISANCE ACTION
The EHA argues that this case should have been decided according to the Island Marine case, in which the hearing examiner determined that all legal nonconforming uses of the property had ceased by 1979. Before a court may apply the ruling of an earlier case to a later one, it must find that both cases have common (1) subject matter, (2) cause of action, (3) persons and parties, and (4) quality of persons for or against whom the claim is made. Hilltop Terrace Homeowner's Ass'n v. Island County, 126 Wash.2d 22, 32, 891 P.2d 29 (1995). The EHA argues that all four elements are met here because, in the earlier case, the parties attempted to establish that their use was legal, the relief requested was the same, and Phillips intervened in the Island Marine case. But the requested relief in the 1982 case was not the same. Then, the tenant was a defendant in a nuisance action. Here, the property owner is the plaintiff in a permit denial action. Additionally, although Phillips intervened in that case, it was then on behalf of his tenant; his rights as owner of the property were not at issue. Therefore, in the 1982 case, not only was the cause of action different, but the interest at stake was significantly less. We agree with the hearing examiner's and the superior court's rulings that the letter has no res judicata effect.
REMAINING ARGUMENTS OF THE EHA
The EHA further argues that the hearing examiner should have applied the City's more restrictive zoning code's prohibition on reconstructing the Strawberry Plant instead of applying the Shoreline Master Program's more permissive approach, and the hearing examiner's decision was not "final" as defined under LUPA because the City could not issue a final decision on Miller's application, *1258 as the application lacked a SEPA checklist and a shoreline exemption permit.
The hearings examiner properly determined that Miller failed to establish that his use of the property at the time of the fire was a lawful nonconforming use in 1969 and upheld the City's permit denial. We need not reach the other issues raised by EHA.
The decision of the superior court is reversed, and the land use examiner's decision is reinstated.
We concur: BRIDGE WATER, J. and ARMSTRONG, J.
NOTES
[1] The property was left off the 1963 zoning map. The City points out that the surrounding parcels indicate that the property may have been zoned residential, but it does not argue that the 1963 zoning enactment is the relevant code for determining the existence of a legal nonconforming use in this case.
[2] The reference here to 1979 appears to be because the current zoning law at the time of the 1982 decision was passed in 1979. The hearing examiner later refers to the 1969 zoning code as the proper one for determining the legal nonconforming uses for the property.
[3] Specifically, Miller testified that his tenants included an accounting firm, a sandwich shop, a woodworking shop, a hardwood flooring company and associated offices, building contracting, a ceramist, an acoustical ceiling company's engineering offices and manufacturing facilities, boat woodworking with office, a plumber's office and storage, a water systems manufacturing and office, an architect, and an artist studio.
[4] We do not read Miller's challenge to this finding to assert that the concrete use discontinued in 1973 or that it or another concrete use resumed sometime after that. To the extent Miller's challenge to this finding does make such assertions, we see no evidence in the record to support them. Instead, we interpret his challenge to mean he challenges the finding that the legal nonconforming use discontinued in 1973.