273 P.3d 490 (2012)
KING COUNTY, a Washington municipal corporation, Jeffrey L. Spencer, a single man, Ronald A. Shear, a single man, Appellants,
v.
KING COUNTY DEPARTMENT OF DEVELOPMENT AND Published Opinion ENVIRONMENTAL SERVICES, an executive agency, Respondent.
Nos. 66432-8-I, 66433-6-I, 66434-1-I.
Court of Appeals of Washington, Division 1.
April 2, 2012.
*491 Cheryl D. Carlson, King County Prosecutor's Office, Seattle, WA, Brian E. Lawler, Denise M. Hamel, Lucy R. Bisognano, Socius Law Group PLLC, Seattle, WA, Robert West, West Law Offices PS, Auburn, WA, for Appellant.
Cristy J. Crag, King County Prosecuting Office, Seattle, WA, for Respondent.
SPEARMAN, J.
¶ 1 Ronald Shear and Jeffrey Spencer appealed a notice of violation, issued by the King County Department of Development and Environmental Services (DDES), for alleged unauthorized operation of a materials processing facility within a critical area. The hearing examiner concluded that Shear and Spencer had established a valid nonconforming use and that the use did not occur within a critical area. DDES filed an appeal under the Land Use Petition Act (LUPA), and the superior court reversed the hearing examiner.
¶ 2 Because the record supports the hearing examiner's findings of fact, which in turn support the examiner's conclusions of law, we reverse the superior court. Shear and *492 Spencer established a valid nonconforming use, and the use did not occur within a critical area. We also hold that the conditions imposed on DDES in the hearing examiner's order did not exceed the examiner's jurisdiction.
¶ 3 We reverse the superior court, reinstate the hearing examiner's decision, and remand to the hearing examiner for further proceedings.

FACTS
¶ 4 Jeff Spencer owns farmland in the Green River Valley. Ron Shear operates an organic materials processing business on Spencer's farm. Other farmers and nursery owners bring Shear organic vegetation such as trees, stumps, brush, leaves, grass, and organic soils that he converts into matter used in animal bedding and fuel. Dust from trucks driving up and down roads on Spencer's property began landing on flowers in a neighbor's flower farm, and the neighbor eventually contacted governmental entities. The King County Department of Development and Environmental Services (DDES) issued a notice of violation on grounds that Shear's use of the farm was an unauthorized "materials processing facility" in a critical area, namely a wetland and flood hazard area.
¶ 5 Spencer and Shear appealed the notice of violation to the King County hearing examiner. The hearing examiner largely agreed with Spencer and Shear, concluding that their use was a valid nonconforming use, and that the county had failed to demonstrate either a wetland or a flood hazard area. DDES challenged the hearing examiner's ruling in superior court by filing a LUPA petition. DDES was represented by the King County Prosecutor's Office. In addition to Spencer and Shear, DDES named "King County" as one of the defendants in the LUPA petition. Shortly thereafter, another deputy prosecutor from the King County Prosecutor's Office appeared on behalf of the King County hearing examiner who heard the case below. That deputy prosecutor filed a brief for the limited purpose of responding to the DDES argument that the hearing examiner did not have jurisdiction to make parts of his ruling. The superior court ruled in favor of DDES. Shear, Spencer, and the King County hearing examiner have appealed to this court.

DISCUSSION

Standard of Review
¶ 6 Judicial review of land use decisions generally proceeds under the Land Use Petition Act (LUPA). RCW 36.70C.030. Relief from a land use decision may be granted if the petitioner carries its burden in establishing one of six standards of relief:
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
RCW 36.70C.130(1).
¶ 7 "`When reviewing a superior court's decision on a land use petition, the appellate court stands in the shoes of the superior court.'" HJS Development, Inc. v. Pierce County, ex rel. Department of Planning and Land Services, 148 Wash.2d 451, 468, 61 P.3d 1141 (2003) (quoting Citizens to Preserve Pioneer Park LLC v. City of Mercer Island, 106 Wash.App. 461, 470, 24 P.3d 1079 (2001)). "`An appellate court reviews administrative decisions on the record of the administrative tribunal, not of the superior court.'" HJS, 148 Wash.2d at 468, 61 P.3d 1141 (quoting King County v. Boundary Review *493 Bd., 122 Wash.2d 648, 672, 860 P.2d 1024 (1993)).
¶ 8 This court reviews a challenge to the sufficiency of the evidence under the substantial evidence standard, viewing the evidence and reasonable inferences in the light most favorable to the prevailing party in the highest forum that exercised fact finding authority. Miller v. City of Bainbridge Island, 111 Wash.App. 152, 162, 43 P.3d 1250 (2002); Friends of Cedar Park Neighborhood v. City of Seattle, 156 Wash.App. 633, 641, 234 P.3d 214 (2010). Additionally, we review application of the law to the facts under the clearly erroneous standard, reversing only when, after considering the entire record, we are firmly convinced the administrative body erred. Woodinville Water Dist. v. King County, 105 Wash.App. 897, 904, 21 P.3d 309 (2001); Quality Rock Products v. Thurston County, 139 Wash.App. 125, 133, 159 P.3d 1 (2007).

Nonconforming Use
¶ 9 DDES issued a Notice of Violation to Spencer and Shear that alleged, in pertinent part, that the two were impermissibly operating a "materials processing facility" in a critical area. DDES contends the hearing examiner's determination that Spencer and Shear established their use of the property was a valid nonconforming use is both "`an erroneous interpretation of the law'" and a "`clearly erroneous application of the law to the facts[.]'" For the reasons described herein, we reverse the superior court and reinstate the hearing examiner's determination of a nonconforming use.
¶ 10 "Generally, `[a] nonconforming use is a use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the [current] zoning restrictions applicable to the district in which it is situated.'" McMilian v. King County, 161 Wash.App. 581, 591, 255 P.3d 739 (2011) (quoting Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wash.2d 1, 6, 959 P.2d 1024 (1998)). "A particular nonconforming use `is defined in terms of the property's lawful use established and maintained at the time the zoning [causing nonconformance] was imposed.'" McMilian, 161 Wash.App. at 591, 255 P.3d 739 (quoting Miller v. City of Bainbridge Island, 111 Wash.App. 152, 164, 43 P.3d 1250 (2002)). "`The use of property must actually be established prior to the adoption of the zoning ordinance to qualify as a nonconforming use thereafter.'" McMilian, 161 Wash. App. at 591, 255 P.3d 739 (quoting Anderson v. Island County, 81 Wash.2d 312, 321, 501 P.2d 594 (1972)). "`Legal, nonconforming uses are vested legal rights.'" McMilian, 161 Wash.App. at 591, 255 P.3d 739 (quoting First Pioneer Trading Co., Inc. v. Pierce County, 146 Wash.App. 606, 614, 191 P.3d 928 (2008)).
¶ 11 Additionally, the King County Code provides the following definition of a nonconforming use:
Any use, improvement or structure established in conformance with King County rules and regulations in effect at the time of establishment that no longer conforms to the range of uses permitted in the site's current zone or to the current development standards of the code due to changes in the code or its application to the subject property.
K.C.C. 21A.06.800. The nonconforming use issue before the hearing examiner in this case was whether Spencer and Shear's use of the property amounted to operation of a materials processing facility before the regulation restricting such activity in critical areas came into existence in September 2004. The hearing examiner found Spencer and Shear established this nonconforming use. We agree with the hearing examiner.
¶ 12 The K.C.C. sets forth the following definition for a "materials processing facility":
Materials processing facility: a site or establishment, not accessory to a mineral extraction or sawmill use, that is primarily engaged in crushing, grinding, pulverizing or otherwise preparing earth materials, vegetation, organic waste, construction and demolition materials or source separated organic materials and that is not the final disposal site.
*494 K.C.C. 21A.06.742 (2004). DDES argues, and the superior court agreed, that because the hearing examiner found that Spencer and Sheer did not began crushing and grinding the earth materials, vegetation, and organic waste on the property until winter of 2004 or spring of 2005, they had not been using the property as a "materials processing facility" before the restriction went into effect in September 2004. But as Shear and Spencer point out, the code does not require crushing and grinding to be taking place for property to be used as a materials processing facility. Indeed, the code indicates property can be used as a material processing facility where the operator is "otherwise preparing" the earth materials, vegetation, and organic waste. K.C.C. 21A.06.742 (2004).
¶ 13 DDES also appears to argue that K.C.C. 21A.06.800 precludes this interpretation because the word "established" is in the past tense. Thus, according to DDES, Shear and Spencer must have completed every step involved in materials processing to have "established" the use. But the King County Code defines the term "established" and includes prospective language in the definition:
The use of a property is defined by the activity for which the building or lot is intended, designed, arranged, occupied, or maintained. The use is considered permanently established when that use will or has been in continuous operation for a period exceeding sixty days. A use which will operate for less than sixty days is considered a temporary use, and subject to the requirements of K.C.C. 21A.32 of this title. All applicable requirements of this code, or other applicable state or federal requirements, shall govern a use located in unincorporated King County. (Ord. 10870 § 328, 1993)
K.C.C. 21A.08.010 (emphasis added). DDES responds with several dictionary definitions of the word "operation": "`[t]he condition of being operative or functioning: in operation'"; and "`[t]he state of being in action: to be in operation'" (QUOTING FUNK AND WAGNALLS' STANDARD DESK DICTIONARY, VOLUME 2 N-Z, FUNK AND WAGNALLS' PUBLISHING Co., 1976). DDES thus appears to contend that every step of the materials processing use must have been in operation for 60 days for the use to be established. We reject this argument. As is described above, the code does not require crushing and grinding to be taking place for property to be used as a materials processing facility, and moreover, the code explicitly includes the prospective word "will" in the definition of "established." These dictionary definitions shed no light on either K.C.C. 21A.06.742 or K.C.C. 21A.08.010, and as such they are of no help here.
¶ 14 DDES next cites to several out-of-state cases for the proposition that "prospective intent" cannot establish a legal nonconforming use. See Response Brief at 16-20. None of these cases are helpful here. In both City of Hillsdale v. Hillsdale Iron & Metal Co., 358 Mich. 377, 100 N.W.2d 467 (1960) and In the Matter of McDonald v. Zoning Bd. of Appeals of Town of Islip, 31 A.D.3d 642, 819 N.Y.S.2d 533 (2006), the issue was not what acts needed to occur before a nonconforming use was established, rather, it was whether a particular use had expanded beyond an already established, valid nonconforming use. In Urban Forest Products, Inc. v. Zoning Bd. of Appeals for Town of Haverstraw, 300 A.D.2d 498, 751 N.Y.S.2d 581 (2002), the issue was whether a use could be converted from a nonconforming vehicle storage lot in a residential zone to another use entirelya commercial landscaping business. Moreover, these cases are of no assistance here since the plain language of K.C.C. 21A.08.010, which defines when a use is established, specifically allows for consideration of prospective intent in making that determination.
¶ 15 Here, the hearing examiner found that before September 2004, Shear had rented the site, equipment was being assembled and stored, grading had occurred, materials for processing organic materials were being stockpiled, and access driveways had been extended. DDES does not appear to dispute these findings, but even if it had, the evidence when viewed in a light most favorable to Shear and Spencer supports the finding. These findings, in turn, support the hearing examiner's conclusion that (1) a materials processing facility, as it would later be defined, was in existence on Spencer's property *495 in April 2004, and (2) it was a legal nonconforming use. As such, we reverse the superior court as to nonconforming use, and reinstate the decision of the hearing examiner.

Flood Hazard Area
¶ 16 Shear and Spencer next argue the superior court erred by concluding the King County Critical Areas ordinance contains an enforceable flood hazard area standard. The superior court concluded, "The King County Code adequately describes the standards applicable to defendants Shear and Spencer. DDES has no burden to prove or adopt an applicable standard beyond that described in the Code." On this issue, the hearing examiner concluded there was no enforceable standard:
2. For purposes of code enforcement, however, the [Critical Areas Ordinance] flood hazard provisions are incomplete. For enforcement purposes one needs also a clear and intelligible standard. KCC 21A.24.230 tells us how DDES should go about formulating such a standard, but until that process is actually undergone, no standard exists.
. . .
4. The relevant code provision states that "a flood hazard area consists of the following components" and then lists five elements, including the floodplain, the floodway, the flood fringe and channel migration zones.
. . . DDES is required to sift through and compare the multiple sources of flood hazard data and evaluate their accuracy in formulating a relevant standard.
. . .
5. . . . Without such a formal regulatory designation, there is no easily ascertainable adopted county flood hazard area standard applicable to the Spencer property, and the portion of the county's notice and order that cites the Appellants for conducting materials processing operations and clearing, grading and filling within a flood hazard area becomes a gesture without legal effect.
¶ 17 DDES contends the King County Code does contain an enforceable flood hazard standard, but that the hearing examiner either ignored it or decided it was unconstitutionally vague. From this premise, DDES argues that ruling on constitutional matters is outside the jurisdiction of the hearing examiner. But the hearing examiner made no ruling on the constitutionality of any code provision. Rather, the hearing examiner concluded the county council and DDES had not adopted standards for determining flood hazard areas. The hearing examiner explains "DDES is required to sift through and compare the multiple sources of flood hazard data and evaluate their accuracy in formulating a relevant standard . . . Without such a formal regulatory designation, there is no easily ascertainable adopted county flood hazard area standard applicable to the Spencer property").
¶ 18 A related argument raised by DDES on this issue is one of law: whether the King County Code itself contains a flood hazard area standard. DDES cites to the "technical terms and land use definitions" part of K.C.C. title 21A, which is the King County zoning code:
21A.06.080 Base flood. Base flood: a flood having a one percent chance of being equaled or exceeded in any given year, often referred to as the "100-year flood."
. . .
21A.06.470 Flood hazard area. Flood hazard area: any area subject to inundation by the base flood or risk from channel migration including, but not limited to, an aquatic area, wetland or closed depression.
21A.06.475 Flood Hazard Boundary Map. Flood Hazard Boundary Map: the initial insurance map issued by FEMA that identifies, based on approximate analyses, the areas of the one percent annual chance, one-hundred-year, flood hazard within a community.
DDES notes that it introduced the Federal Emergency Management Act (FEMA) maps into evidence, and that the hearing examiner found Spencer's property was within the 100-year flood area designated on the FEMA maps. DDES thus argues the county *496 council defined "flood hazard area" as the 100-year flood hazard designated on FEMA maps.
¶ 19 We reject this argument. A statute's meaning is derived "from all that the [legislative body] has said in the statute and related statutes which disclose legislative intent about the provision in question." Department of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 11, 43 P.3d 4 (2002). We must not read any provision in isolation but look at the statute as a whole. Id. In its interpretation, DDES ignores other portions of the King County zoning code that was passed in the same ordinance (King County Ord. 15051 (2004)) as the provisions in K.C.C. 21A.06 to which DDES cites. Indeed, in the very same ordinance, the council made it clear that the Department was to undertake a specific process in delineating flood hazard areas:
21A.24.230 Flood hazard areascomponents.
A. A flood hazard area consists of the following components:
1. Floodplain;
2. Zero-rise flood fringe;
3. Zero-rise floodway;
4. FEMA floodway; and
5. Channel migration zones.
B. The department shall delineate a flood hazard area after reviewing base flood elevations and flood hazard data for a flood having a one percent chance of being equaled or exceeded in any given year, often referred to as the "one-hundred-year flood." The department shall determine the base flood for existing conditions. If a basin plan or hydrologic study including projected flows under future developed conditions has been completed and approved by King County, the department shall use these future flow projections. Many flood hazard areas are mapped by FEMA in a scientific and engineering report entitled "The Flood Insurance Study for King County and Incorporated Areas." When there are multiple sources of flood hazard data for flood plain boundaries, regulatory floodway boundaries, base flood elevations, or flood cross sections, the department may determine which data most accurately classifies and delineates the flood hazard area. The department may utilize the following sources of flood hazard data for floodplain boundaries, regulatory floodway boundaries, base flood elevations or cross sections when determining a flood hazard area:
1. Flood Insurance Rate Maps;
2. Flood Insurance Studies;
3. Preliminary Flood Insurance Rate Maps;
4. Preliminary Flood Insurance Studies;
5. Draft flood boundary work maps and associated technical reports;
6. Critical area reports prepared in accordance with FEMA standards contained in 44 C.F.R. Part 65 and consistent with the King County Surface Water Design Manual provisions for floodplain analysis;
7. Letter of map amendments;
8. Letter of map revisions;
9. Channel migration zone maps and studies;
10. Historical flood hazard information;
11. Wind and wave data provided by the United States Army Corps of Engineers; and
12. Any other available data that accurately classifies and delineates the flood hazard area or base flood elevation.
K.C.C. 21A.24.230.
¶ 20 Thus, although the county council indicated in a definition section that flood hazard areas are those areas "subject to" the 100-year floods as set forth in FEMA maps, the council in the same legislation set forth an extremely detailed process by which DDES was to examine a wide variety of sources of information on flooding, weigh the data, and after that, designate specific flood hazard areas. DDES'S interpretation of the zoning code reads K.C.C. 21A.24.230 out of the statutory scheme entirely, and we decline to adopt it. The hearing examiner's interpretation of the county code was correct, and we reverse the superior court on this issue.

*497 Jurisdiction of Hearing Examiner

¶ 21 Shear, Spencer, and the hearing examiner all argue the superior court incorrectly held that the hearing examiner exceeded his jurisdiction and authority by imposing conditions and limitations on the Department's permit and review process. DDES responds that the hearing examiner's decision to impose conditions on the continued permitting process amounted to improperly "directing the scope of permit review, precluding additional critical areas review in violation of SEPA requirements, and limiting and directing the manner in which DDES would be allowed to exercise its decision-making authority. . . ." We agree with the hearing examiner and reverse the superior court for the reasons described herein.
¶ 22 Although the hearing examiner found in large part in favor of Shear and Spencer, including on the issue of the County's failure to demonstrate a wetland or flood hazard area, he also found that the expansion of the materials processing activity on the Spencer property required them to obtain a conditional use permit. The hearing examiner decided to impose conditions on this permitting process, because it was DDES' position that Shear and Spencer's operations must cease entirely:
DDES's position, on the other hand, as expressed in its notice and order, is that wetlands and flood hazard areas exist unequivocally on the Spencer property and that Mr. Shear's materials processing facility use must be terminated because it impinges on such critical areas. . . . Accordingly, the conditions attached to this appeal decision will place appropriate limitations on further review designed to preserve to the Appellants the successful elements of their appeal and will retain Hearing Examiner jurisdiction to the extent necessary to assure that these limitations are observed.
The conditions imposed by the hearing examiner upon the DDES permitting process are, in pertinent part:
A. The scope of the CUP review shall be limited to consideration of a proposal to expand the materials processing facility to use to include onsite screening and grinding of organic raw materials, the impacts of increased levels of delivery and storage of raw materials on the site and the transport of finished product offsite, and the scope and management of onsite retail operations. The baseline legal NCU not subject to CUP review shall be defined by the uses in existence on the site on September 28, 2004. The Appellants shall not be required to demonstrate during CUP review that the proposed facilities are at a scale appropriate to process the organic waste generated in the agricultural zone.
B. The conditional use and grading permit review procedures shall not be used to prohibit, directly or indirectly, continued operation of a viable materials processing facility use at the site.
C. DDES shall not require further studies or review of whether the Spencer property is within a flood hazard area or contains a jurisdictional wetland, except that:
(i) a code-mandated buffer may be required to protect the offsite open-water wetland feature on the parcel adjacent to the north; and
(ii) requirements for the location and configuration of storage piles may take into account potential floodwater patterns.
¶ 23 DDES claims K.C.C. 20.24.100 does not provide the hearing examiner with the authority to impose the above conditions. DDES cites to the list of conditions set forth in K.C.C. 20.24.100 and notes that "none" are "relate[d] to agency decision making processes." DDES then argues "[i]t is a basic tenet of statutory construction that, when the legislature lists various items in a statute but omits others the courts should assume that the times omitted were left out intentionally," (citing State v. Gamble, 146 Wash.App. 813, 817-18, 192 P.3d 399 (2008)). But DDES is selectively quoting the code provision, which makes it clear that the list is a nonexclusive list of conditions a hearing examiner may impose:

*498 The examiner is authorized to impose conditions, modifications and restrictions, including but not limited to setbacks, screenings in the form of landscaping or fencing, covenants, easements, road improvements and dedications of additional road right-of-way and performance bonds as authorized by county ordinances.
K.C.C. 20.24.100 (emphasis added).
¶ 24 DDES also argues In re King County Hearing Examiner, 135 Wash.App. 312, 144 P.3d 345 (2006) controls here. We disagree. In that case, although a hearing examiner found an Environmental Impact Statement (EIS) to be adequate and thereby denied an appeal, he nevertheless ordered a supplemental EIS to be performed. We held "[t]he KCC states that the hearing examiner can grant an appeal with conditions, but does not give the examiner the authority to deny an appeal with conditions." In re King County Hearing Examiner, 135 Wash.App. at 321, 144 P.3d 345 (emphasis added). Here, by contrast, the hearing examiner did not deny the appeal with conditions, but instead, granted Shear and Spencer's appeal and set conditions necessary to preserve the effect of his ruling.
¶ 25 DDES finally contends that the conditions imposed by the hearing examiner in essence completely exempt Shear and Spencer from all applicable regulation, such as, for example, SEPA. We disagree. The hearing examiner's findings regarding a lack of wetlands and flood hazard areas at the time Shear and Spencer began their nonconforming use, does not prevent application of SEPA or any other regulatory scheme. Likewise, nothing in the conditions indicates Shear and Spencer are exempt from SEPA or any other regulatory scheme. To the extent a review under SEPA or some other state or federal statute is implicated in the conditional use permit process, or at some other time in the future, this is little more than speculation that is not before us. We reject these arguments. In short, the superior court erred in holding the hearing examiner exceeded his jurisdiction.
¶ 26 We reverse the superior court, reinstate the hearing examiner's decision, and remand to the hearing examiner for further proceedings.
WE CONCUR: BECKER and APPELWICK, JJ.